**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RTC INDUSTRIES, INC., | ) | |
| | ) | |
| Plaintiff / Counterclaim-Defendant, | ) | Case No. 18-cv-861 |
| | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| v. | ) | |
| | ) | |
| FASTENERS FOR RETAIL, INC., | ) | |
| | ) | |
| Defendant / Counterclaim-Plaintiff. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

RTC Industries, Inc. ("Plaintiff") moved to dismiss several of Fasteners for Retail, Inc.'s ("Defendant") counterclaims [187; 343]. For the reasons stated below, Plaintiff's motion to dismiss Defendant's fourth counterclaim and third affirmative defense [343] is granted in part and denied in part. It is granted with respect to Defendant's claims of equitable estoppel, waiver, and inequitable conduct regarding the '427 patent. Accordingly, this portion of the counterclaim is dismissed with prejudice.[1] Defendant's third affirmative defense is stricken to the same extent. The motion is denied with respect to Defendant's claims of equitable estoppel, waiver, and inequitable conduct regarding the '720 patent. The Court also grants Plaintiff's request to strike paragraph 147 and 167–171 (inclusively) from Defendant's counterclaims [320] under Federal Rule of Civil Procedure 12(f). Plaintiff's motion to dismiss Defendant's second and third counterclaims [187] is denied.

---

[1] In granting Defendant leave to amend, the Court stated it was permitting "Defendant to file its best (and last)" counterclaims. [296].

## I.    Background[2]

Both parties are corporations in the business of providing merchandise display systems commonly used on shelves at major retailers.  [320, at ¶¶ 9–10].  Plaintiff brought this case against Defendant, alleging that Defendant's Power Zone Sure-Set Self-Facing System ("Sure-Set System") infringes two of its patents: United States Patent No. 8,096,427 ("the '427 patent") entitled "Product Management Display System" and United States Patent No. 6,041,720 ("the '720 patent") also entitled "Product Management Display System."  [92, at ¶¶ 16–34].  Defendant filed several affirmative defenses and counterclaims.  [See 320].  Relevant here, Defendant alleges that Plaintiff's '720 and '427 patents are unenforceable under the theories of equitable estoppel, waiver, and inequitable conduct.  [Id., at ¶¶ 91–108].  Similarly, in its third affirmative defense, Defendant asserts that these two patents are unenforceable.  [Id., at ¶¶ 44–49].  Defendant also contends that Plaintiff's ProfitGuard Multi-Flip Window System ("Multi-Flip System") infringes two of Defendant's patents: United States Patent No. 8,167,149 ("the '149 patent") and United States Patent No. 8,152,006 ("the 006 patent"). [320, at ¶¶ 44–90].  In two separate motions, Plaintiff moved to dismiss these three counterclaims and to strike Defendant's third affirmative defense. See [187; 343].

### A.    The Parties' 2010 Agreement and the Sure-Set System

Defendant launched the Sure-Set System in 2006.  [320, at ¶ 139].  In 2010, the parties signed a Settlement and License Agreement ("2010 agreement") covering the Sure-Set System. See [345-1].  At the time of the 2010 agreement, Defendant had made over $29 million in total

---

[2] The Court accepts as true all of Defendant's well-pleaded factual allegations and draws all reasonable inferences in Defendant's favor.  *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). Additionally, this background section relies on documents attached to the parties' briefs.  The Court may consider these documents because they are central to the complaint and referred to in it.  See *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 493 n.2 (7th Cir. 2017).

sales in the Sure-Set product line. [320, at ¶ 109]. Defendant alleges that, prior to the agreement, Plaintiff was aware of the Sure-Set System because, as early as 2008, its CEO, Richard Nathan, "was forwarded an email showing detailed line drawings" of the Sure-Set System. [*Id.*, at ¶ 100]. Nathan also received an email attaching a scanned page from Defendant's product catalog dedicated to the Sure-Safe System in 2009. [*Id.*]. Nathan signed the 2010 agreement on behalf of Plaintiff. [*Id.*, at ¶ 101]. The agreement related in part to whether the Sure-Set System infringed Plaintiff's Pusher Patents, which included the '720 patent. The Pusher Patents also include United States Patent No. 6,964,235 (the '235 patent). [345-1, at 4]. The 2010 agreement refers to Plaintiff as RTC and Defendant as FFR, and it includes the following provision:

> RTC represents and warrants that, to the best of its knowledge, information and belief, as of the Effective Date, FFR has not infringed, and is not infringing, directly or indirectly, any of the Pusher Patents that have not been licensed to FFR prior to the Effective Date. RTC expressly reserves the right to assert infringement claims against FFR in the future on any patent that claims priority to one of the Pusher Patents but has not issued as of the Effective Date. RTC also expressly reserves the right to assert infringement claims against FFR in the future on any of the Pusher Patents with respect to activities of FFR (past, present or future) that RTC, to the best of its knowledge, information and belief as of the Effective Date, is not aware are infringing (directly or indirectly) on one or more of the Pusher Patents.

[*Id.*].

### B.  Background on Plaintiff's Patents

Two of Plaintiff's patents are primarily at issue here: the '427 patent and the '720 patent.

#### 1.  The '427 Patent

The '427 patent is related to the '235 patent and to U.S. Patent No. 7,891,503 ("the '503 patent). [320, at ¶ 161; 384, at 7]. Specifically, '503 patent is the immediate parent of the '427 patent. [92-2, at 2; 345, at 6; 384, at 7]. The '427 patent claims priority to the '235 patent and is a continuation of the '235 patent. [92-2, at 18; 320, at ¶ 161; 384, at 7]. During prosecution of the '235 patent, the examiner cited U.S. Patent No. 4,762,236 ("the '236 patent") and "stated that the

'236 patent was 'pertinent to applicant's disclosure' and 'teach[es] similar structure to applicant's.'"  [320, at ¶ 161 (alteration in original)].

In relation to the prosecution of the '427 patent, Plaintiff submitted an information disclosure statement ("IDS") to the Patent and Trademark Office ("PTO").  [346-1].  The IDS listed 337 references, including the '236 patent.  [320, at ¶ 158; 346-1, at 10].  In the IDS cover letter, Defendant explained that it provided the references "[p]ursuant to the duty of disclosure under 37 C.F.R. §§ 1.56 and 1.97–1.98."  [346-1, at 2].  The cover letter also states that "[c]opies of the cited references were submitted in an Information Disclosure Statement filed in the parent application 11/465,936 or were cited by the Examiner in parent application 11/465,936."  [*Id.*].  This parent application (11/465,936) became the '503 patent.  [92-2, at 2].  The examiner did not cite to the '236 patent during the prosecution of the '427 patent.  [320, at ¶ 158].  Plaintiff alleges that the examiner failed to do so because (1) Defendant buried the reference to the '236 patent among 337 other references and (2) Defendant's cover letter directed the examiner away from the materiality of the '236 patent because the cover letter refers to the application for the '503 patent, which does not reveal the '236 patent's materiality, as opposed to referring to the '235 patent, which does reveal the '236's patent's materiality.  [320, at ¶¶ 158; 384, at 7].

## 2.    The '720 Patent

Stephen Hardy is the named inventor of the '720 patent, and he assigned his rights in the patent to Plaintiff.  [320, at ¶ 118].  Attorney Pieter van Es represented Hardy during the prosecution of the '720 patent, and attorney William Klein signed several filings with the PTO during the prosecution of the '720 patent.  [*Id.*, at ¶ 119].  John Swafford occupied the IP Management role at RTC and was responsible for coordinating with prosecution counsel to file the '720 patent.  [*Id.*, at ¶ 120].  Hardy communicated with Joe Berghammer and Scott Burow

about the patent application process, and Berghammer and Burow relayed these conversations to van Es and Klein. [*Id.*, at ¶ 121].

Hardy, Swafford, van Es, and Klein initially failed to disclose any prior art references to the PTO during the prosecution of the '720 patent. [*Id.*, at ¶ 125]. The "examiner issued an office action rejecting all of the pending claims as being obvious over U.S. Patent No 4,830,201 ('the '201 patent') to Breslow," the inventor of the '201 patent. [*Id.*, at ¶¶ 126–27]. RTC is also the assignee of the '201 patent, and RTC employed Breslow during the prosecution of the '720 patent. [*Id.*, at ¶ 127]. Hardy and Breslow "communicated about merchandise display projects during the time of the prosecution of the '720 patent." [*Id.*]. In response to the office action, Hardy and Klein submitted an IDS reference disclosing three prior art references, including U.S. Patent No. 4,934,645 ("the '645 patent"), which Breslow invented. [*Id.*, at ¶ 128]. They did not disclose U.S. Patent No. 4,712,694 ("the '694 patent"), which Breslow also invented. [*Id.*, at ¶ 129]. Defendant alleges that the '694 patent is material to the patentability of the '720 patent because the '694 patent discloses "each and every element of claim 1 of the '720 patent, other than a gondola shelf," which was "ubiquitous in the industry at all times during the prosecution of the '720 patent." [*Id.*, at ¶ 132].

The '645 patent (which was disclosed during prosecution of the '720 patent application) and the '694 patent (which was not), "relate to the same subject matter, are assigned to the same inventor, and were readily accessible to" Hardy, Swafford, Klein, and van Es. [*Id.*, at ¶ 129]. Defendant alleges that it was implausible for these individuals to have a "found just one of Mr. Breslow's patents in a search yet did not find the '694 patent." [*Id.*, at ¶ 133]. Further, the '694 patent was cited by the examiner during the prosecution of another of Plaintiff's patents that issued nine days before the Plaintiff filed the application for the '720 patent. [*Id.*, at ¶ 129]. Additionally,

two years before the prosecution of the '720 patent, RTC marked a product called "Clearview" with the '694 Patent number.[3]   [384, at 9; 384-4].   At that time, Swafford was head of IP Management and "was responsible for identifying which products should be marked with which patents." [384, at 9; 385-5].  In 1999, during the prosecution of the '720 patent, Hardy drafted Clearview drawings marked with the '694 patent.[4]  [384, at 9].  Hardy was aware of his obligation to disclose relevant art to the PTO.  [320, at ¶ 124].

### C.   Plaintiff's Covenant and Payment to Defendant

In its second and third counterclaims, Defendant alleges that Plaintiff's Multi-Flip System infringes Defendant's '149 and '006 patents. [320, at ¶¶ 44–90].  Plaintiff sold its last Multi-Flip System in 2019.  [188-4, at ¶ 5].  As part of this litigation, Plaintiff's CEO, Nathan, executed a declaration stating that data from Plaintiff's "financial software" shows that Plaintiff's "total lifetime gross revenue from sales of Multi-Flip is $36,358.12." [*Id.*, at ¶ 10].  Nathan declared that although Plaintiff denies that the Multi-Flip System infringes Defendant's patents, it "believes that continued litigation over" the counterclaims "is not warranted" due in part to the "significant time, money, and resources required to litigate" these claims.  [*Id.*, at ¶ 11].  As such, Plaintiff's counsel

---

[3] Defendant learned of this and the remaining information in this paragraph during discovery and did not include the information in its counterclaim. [384, at 9]. Plaintiff argues that the Court cannot consider this information because a party "cannot amend its pleading through its opposition." [389, at 4].  However, "in the district court * * * a party opposing a Rule 12(b)(6) motion may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); see also *DS Smith Plastics Ltd.*, 2016 WL 69632, at *5 (relying on charts attached to a response to a motion to dismiss an inequitable conduct counterclaim because a nonmovant may set forth additional facts in a Rule 12(b)(6) opposition brief if those facts are consistent with the pleadings). Accordingly, the Court considers the additional information included in Defendant's response brief.

[4] The Court notes that the exhibits filed in support of this assertion are of low quality.  See [384-1, 384-2; 384-3]. Although the Court could identify Hardy's name on Exhibit 4 [384-3], the Court could not identify any information indicating that Hardy drew the drawing or that it was marked with the '694 patent.  That said, Plaintiff did not object to this characterization of these drawings, and, at the motion-to-dismiss stage, the Court draws all reasonable factual inferences in favor of Defendant.  See *Killingsworth*, 507 F.3d at 618.

contacted Defendant's counsel, explaining that Plaintiff was "unilaterally ending the dispute" over these two counterclaims by providing (1) "an unconditional and irrevocable covenant not to make, use, sell, offer to sell, or import in the U.S." the Multi-Flip System and (2) a cashier's check for $40,000. [188-4, at 11].

## II.    Legal Standard

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint typically must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S at 555). In determining whether the complaint meets this standard, the Court accepts as true all of Plaintiff's well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor. *Killingsworth*, 507 F.3d at 618. Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake," though "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## III.    Analysis

### A.    Counterclaim and Defense Regarding Enforceability of Patents '427 and '720

#### 1.    Inequitable Conduct

Defendant claims that Plaintiff's patents '427 and '720 are unenforceable due to Plaintiff's inequitable conduct. "Federal Circuit law governs whether the alleged facts constitute inequitable

conduct." *DS Smith Plastics Ltd. v. Plascon Packaging, Inc.*, 2016 WL 69632, at *3 (N.D. Ill. Jan. 6, 2016). Inequitable conduct occurs when "(1) an individual associated with the filing and prosecution of a patent application made an affirmative misrepresentation of a material fact, failed to disclose material information, or submitted false material information; and (2) the individual did so with a specific intent to deceive the PTO." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 n.3 (Fed. Cir. 2009). Because inequitable conduct involves allegations of fraud, Rule 9(b) applies, and "the pleading must identify the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Id.* at 1328. However, Rule 9(b) also states that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." In the inequitable conduct context, the Federal Circuit has interpreted Rule 9(b) to require pleadings to include "sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO." *Exergen Corp.*, 575 F.3d at 1328–29. "A reasonable inference is one that is plausible and that flows logically from the facts alleged, including any objective indications of candor and good faith." *Id.* at 1329 n.5.

### a. The '427 Patent

Defendant alleges that Plaintiff engaged in inequitable conduct with respect to the '427 patent when it "buried material references by citing a burdensome number of references—337— to the examiner." [320, at ¶ 157]. In particular, Defendant alleges that Plaintiff buried a reference to the '236 patent (referred to by the parties in their briefs as "Jackle") and that, had the examiner reviewed the '236 patent, the examiner would have rejected one or more claims of the '427 patent. [*Id.*, at ¶ 158]. Defendant also argues that Plaintiff's IDS cover letter affirmatively directed the

patent examiner away from the materiality of the '236 patent by citing to only the application for the '503 patent, which does not reveal the '236 patent's materiality, as opposed to referring to the '235 patent, which does reveal the '236's patent's materiality.  [384, at 11].  Plaintiff argues that Defendant's inequitable conduct allegations fail to state a claim regarding the '427 patent for a variety of reasons, including that (1) burying allegations fail to state an inequitable conduct claim as a matter of law and (2) Defendant fails to allege sufficient facts to demonstrate intent to deceive the PTO.

Regarding whether burying allegations can support an inequitable conduct claim, the parties direct the Court to two cases from the Federal Circuit: *Molins PLC v. Textron, Inc.*, 48 F.3d 1172 (Fed. Cir. 1995) and *Fiskars, Inc. v. Hunt Manufacturing. Co.*, 221 F.3d 1318 (Fed. Cir. 2000).  In *Molins*, a company had begun then abandoned foreign patent applications, but successfully prosecuted the related U.S. patent in front of the PTO.  *Molins*, 48 F.3d at 1176–77. Later, a new manager assumed responsibility of a company's patent department and determined that the company had failed to include art references in the PTO application that were included in the abandoned foreign applications.  *Id.*  Upon this discovery, the manager "filed a lengthy prior art statement," listing a particularly material reference "together with all other prior art references that had been cited during the foreign prosecution."  *Id.* at 1177.  "The citation was not accompanied by any comment or discussion concerning the relevancy of the" prior art.  *Id.* at 1183. The company was later sued for inequitable conduct, in part based on a claim that the manager buried the material reference with other prior art references.  *Id.*  The district court found after a bench trial that the manager had engaged in inequitable conduct by burying the reference, but the Federal Circuit reversed.  *Id.* at 1183–84.  In doing so, however, the Federal Circuit noted that the Manual of Patent Examining Procedure ("MPEP") encouraged highlighting the relevance of cited

material prior art, and it stated that "'burying' a particularly material reference in a prior art statement containing a multiplicity of other references can be probative of bad faith." *Id.* at 1184. Defendant relies on this statement to argue that that "Federal Circuit expressly recognizes burying as a cognizable claim" [384, at 5]; Plaintiff argues that this statement is *dicta* and that *Fiskars* forecloses any possibility of a burying claim. [389, at 3].

In *Fiskars*, an applicant submitted a relevant reference to the examiner, but the examiner drew a line through it, indicating that he did not consider it. *Fiskars*, 221 F.3d at 1327. In an inequitable conduct suit, the opposing party argued that the examiner's act placed on the applicant "the obligation to stress to the examiner the relevance" of the reference. *Id.* Both the district court and the Federal Circuit concluded that there was no inequitable conduct because "[a]n applicant can not be guilty of inequitable conduct if the reference was cited to the examiner, whether or not it was a ground of rejection by the examiner." *Id.*; *cf. Scripps Clinic & Rsch. Found. v. Genentech, Inc.*, 927 F.2d 1565, 1582 (Fed. Cir. 1991), overruled in part on other grounds by *Abbott Lab'ys v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009) ("When a reference was before the examiner, whether through the examiner's search or the applicant's disclosure, it can not be deemed to have been withheld from the examiner."). Defendant argues that, after *Fiskars*, burying cannot lead to an inequitable conduct claim. District courts have split on the issue. Compare, *e.g.*, *CIVIX-DDI, LLC v. Hotels.com, L.P.*, 711 F. Supp. 2d 839, 849 (N.D. Ill. 2010) (finding that the defendant stated burying claim for inequitable conduct by alleging that the plaintiff submitted material reference in a "'mountain' of prior art" and failed to identify the reference when "the PTO examiner specifically requested a clarification or explanation of the prior art references"), with *Symbol Techs., Inc. v. Aruba Networks, Inc.*, 609 F. Supp. 2d 353, 358 (D. Del. 2009) ("While dicta in *Molins* supports the contention that 'burying' a reference can be probative of bad faith, the Court

10

concludes that this is contradicted by the decision of the case and by the clear precedent of *Scripps* and *Fiskars*.").

Here, the Court need not definitely resolve this issue because even if burying allegations can support inequitable conduct claims, the Court agrees with Plaintiff that, in this instance, Defendant's counterclaim fails to allege facts from which the Court can reasonably infer that Plaintiff acted with specific intent to deceive the PTO. *Molins* stated that burying "*can be* probative of bad faith," implying that it is not *always* probative of bad faith and suggesting that additional facts indicative of intent are necessary. *Molins*, 48 F.3d at 1184 (emphasis added); see also *Nomadix, Inc. v. Hosp. Core Servs. LLC*, 2015 WL 3948804, at *9 (C.D. Cal. June 29, 2015) ("Exactly under what circumstances 'burying' supports an inference of bad faith is unclear from the cases."); *Seaboard Int'l, Inc. v. Cameron Int'l Corp.*, 2013 WL 3936889, at *6 (E.D. Cal. July 30, 2013) (agreeing with "several district courts [that] have held that the alleged burying of material information in a long list of citations to the PTO by itself is insufficient to state a claim for inequitable conduct"). Defendant alleges that Plaintiff "wanted the '427 Patent to issue at all costs in an effort to obtain new patents to assert against FFR's" Sure-Set System and that the cover letter affirmatively directed the examiner away from the materiality of the '236 patent. [320, at ¶ 164; 384, at 7]. However, alleging an interest in securing a patent cannot sufficiently demonstrate intent to deceive, as presumably everyone who prosecutes a patent hopes to secure it. See *Kranos IP Corp. v. Riddell, Inc.*, 334 F. Supp. 3d 907, 915–16 (N.D. Ill. 2018) (concluding that the allegation that individuals "stood to benefit" from patent does not sufficiently allege intent to deceive because "virtually everyone involved in a patent's prosecution stands to benefit in some way from its issuance"). Moreover, the Court is not persuaded that the cover letter affirmatively misled the examiner away from the '236 patent. For example, if there had been no cover letter at

all, it does not seem any more likely that the examiner would or would not have considered the '236 patent.

Further, Plaintiff notes that Rule 609 of the MPEP states that "[t]he examiner will consider information which has been considered by the Office in a parent application" when examining particular categories of applications and that a "listing of the information need not be resubmitted in the continuing application." MPEP § 609.02. Plaintiff argues that because the '236 patent was expressly considered during the prosecution of the '235 patent and cited in the '427 patent's immediate parent's application, Plaintiff was not required to submit the '236 patent in the application for the '427 patent. [345, at 6–7]. Defendant does not argue that Plaintiff was obligated to submit the '236 patent during the prosecution of the '427 patent.[5] [384, at 7 n.2]. Instead, Defendant argues that Plaintiff's argument on this point is "irrelevant" because Plaintiff *did* resubmit the '236 patent "but buried it and directed the examiner away from the PTO's express finding of [its] pertinence." [*Id.*]. However, Defendant fails to explain how submitting a reference—even if done in a nonobvious fashion—could create an inference of an intent to deceive if Plaintiff was never obligated to submit the reference in *any* fashion in the first place. See *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 547 (Fed. Cir. 1998) (explaining that not resubmitting information as permitted by MPEP Rule 609 "can not be inequitable conduct").

Moreover, as Plaintiff notes, the examiner initialed the '236 patent on the IDS. [345, at 5–6; 346-1, at 10]. In *Molins*, the Federal Circuit explained that when an examiner initials references, it assumes that "the examiner did consider references," "[a]bsent proof to the contrary." *Molins*, 48 F.3d at 1184. The Court recognizes that *Molins* reviewed an appealed judgment, where the

---

[5] Therefore, the Court concludes that both parties are in agreement that Plaintiff was not required to submit the '236 patent when prosecuting the '427 patent.

party had to prove inequitable conduct by clear and convincing evidence, as opposed to plead inequitable conduct. See *Exergen Corp.*, 575 F.3d at 1329 n.5. However, here, nothing in the counterclaims permits a reasonable inference that the examiner did not review the '236 patent.[6] *C.f. SynQor, Inc. v. Cisco Sys., Inc.*, 2012 WL 12892779, at *3, *6 (E.D. Tex. Aug. 7, 2012), report and recommendation adopted, 2012 WL 3984865 (E.D. Tex. Sept. 11, 2012) (inferring that examiner did not review initialed reference when party alleged that "the examiner considered all of the more than 1000 references submitted by SynQor on that single day and spent an average of less than 1 minute reviewing each reference"). And, in *Molins*, the Federal Circuit relied in part on the fact that the examiner considered the buried reference in determining that there was no inequitable conduct.

In sum, the counterclaim does not allege sufficient facts from which the Court can reasonably infer that Plaintiff acted with specific intent to deceive the PTO. The patent examiner's indication that she did review the '236 patent further cuts against a finding that Defendant states a claim for inequitable conduct. As such, the Court dismisses with prejudice Defendant's inequitable counterclaim with respect to the '427 patent.

### b.    The '720 Patent

Plaintiff argues that Defendant fails to state an inequitable conduct claim regarding the '720 patent because it failed to plead facts sufficient to demonstrate subjective knowledge of the '694 patent's materiality and intent to deceive the PTO. Defendant alleges that four individuals committed inequitable conduct: Hardy, Swafford, van Es, and Klein. As to van Es and Klein,

---

[6] Defendant alleges that, in relation to a different patent, the Patent Trial and Appeal Board panel stated that "[b]ased on the voluminous number of prior art documents before the examiner, we are skeptical that the examiner was able to devote sufficient time to evaluate all of the asserted art in detail during prosecution." [320, at ¶ 162]. But this does not plausibly allege that the examiner did not review the initialed '236 patent in the '427 patent's application. See *N. Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 939 (Fed. Cir. 1990) ("It is presumed that public officials do their assigned jobs.").

Defendant alleges that they knew of the '694 patent's materiality because: (1) they were on notice of the materiality of Breslow's '201 patent after the PTO rejected pending claims as being obvious over the '201 patent; (2) they searched for, found, and disclosed the '645 patent, which relates to the same system for displaying merchandise and is assigned to the same inventor (Breslow) as the '694 patent; (3) the '694 patent was assigned to the Plaintiff readily accessible to van Es and Klein; and (4) nine days before they filed the application for the '720 patent, a patent examiner cited the '694 patent during the prosecution of another of Plaintiff's patents. [320, at ¶¶ 126–130]. From this, the Court can at most infer that van Es and Klein knew of the '694 patent. However, there are not sufficient facts to plausibly support the inference that van Es and Klein knew of the materiality of the '694 patent to the '720 patent. See *Exergen Corp.*, 575 F.3d at 1330 (explaining that, on a motion to dismiss an inequitable conduct claim, "one cannot assume that an individual, who generally knew that a reference existed, also knew of the specific material information contained in that reference"). Accordingly, Defendant does not state an inequitable conduct claim with respect to either van Es or Klein.

With respect to Swafford's knowledge of the '694 patent's materiality, Defendant alleged the same facts as it did with respect to van Es and Klein. Defendant also alleged that two years before the prosecution of the '720 patent, RTC marked a product called "Clearview" with the '694 Patent number. [384, at 9; 384-4]. At that time, Swafford was head of IP Management and "was responsible for identifying which products should be marked with which patents." [384, at 9; 385-5]. This additional fact suggests that Swafford knew of the '694 patent's contents in 1995, two year before the filing of the application for the '720 patent. However, this additional fact is insufficient to support a plausible inference that two years later Swafford was able to identify the '694 patent as material to the '720 patent.

14

With respect to Hardy's knowledge of the '694 patent's materiality, Defendant again alleged the same facts as it did with respect to van Es and Klein. Additionally, Defendant alleged that during the prosecution of the '720 patent, Hardy and Breslow "communicated about merchandise display projects." [320, at ¶ 127]. Defendant also alleged that during the prosecution of the '720 patent, Hardy drafted Clearview drawings marked with the '694 patent. [384, at 9]. These allegations indicate that Hardy not only knew of the '694 patent's existence, but that he was sufficiently familiar with its contents at the time of the prosecution of the '720 patent. Thus, these allegations support a reasonable inference that Hardy knew of the '694 patent's materiality.

Plaintiff next argues that even if Defendant alleged that any of the individuals knew of the '694 patent's materiality, Defendant did not allege facts sufficient to demonstrate that any individual acted with intent to deceive the PTO. [345, at 10–11; 389, at 10–12]. Ultimately, to prove inequitable conduct, a party has to demonstrate intent with "clear and convincing evidence." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011). Because there is rarely direct evidence of deceptive intent, courts can "infer intent from indirect and circumstantial evidence." *Id.* "[T]o meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Id.* (quoting *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)). At the pleading stage, however, an inference of deceptive intent need only be "be reasonable and drawn from a pleading's allegations of underlying fact." *Exergen Corp.*, 575 F.3d at 1329 n.5. Here, Defendant alleged that (1) Hardy knew of the '694 patent's materiality during the prosecution of the '720 patent, (2) Hardy was on notice that the PTO issued an office action rejecting the '720 patent as being obvious over another of Breslow's patents, and (3) Hardy disclosed other prior art references after the office action, but did not disclose the '694 patent. An

15

inference of intent to deceive the PTO is plausible and flows logically from these alleged facts. See *Sanders v. The Mosaic Co.*, 418 F. App'x 914, 919 (Fed. Cir. 2011) (making an inference of intent to deceive the PTO at motion-to-dismiss stage based on allegations that an individual failed to disclose an expert's financial connection with him and his company without reciting additional facts). Therefore, the Court will not dismiss Defendant's inequitable conduct claim with respect to Hardy's conduct during the '720 patent prosecution. The remainder of the inequitable conduct claim is dismissed, and the inequitable conduct affirmative defense is stricken to the same extent.

## 2. Equitable Estoppel and Waiver

Next, Defendant claims that Plaintiff's patents '427 and '720 are unenforceable due to equitable estoppel and waiver. "Three elements are required for equitable estoppel to bar a patentee's suit: (1) the patentee, through misleading conduct (or silence), leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; (2) the alleged infringer relies on that conduct; and (3) the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim." *Radio Sys. Corp. v. Lalor*, 709 F.3d 1124, 1130 (Fed. Cir. 2013). "Misleading conduct occurs when the alleged infringer is aware of the patentee or its patents, and knows or can reasonably infer that the patentee has known of the allegedly infringing activities for some time." *High Point SARL v. Sprint Nextel Corp.*, 817 F.3d 1325, 1330 (Fed. Cir. 2016). With respect to waiver, both parties agree that waiver occurs when a patent holder's "conduct was so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished." *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1020 (Fed. Cir. 2008); see also [345, at 12; 384, at 12]. Plaintiff argues that Defendant failed to state a claim for equitable estoppel and waiver because the language of the 2010 agreement made it impossible for Defendant to reasonably believe that Plaintiff did not

16

intend to enforce its patent rights.  [345, at 11–13].

 With respect to the '427 patent, Plaintiff notes that it was issued after the execution of the 2010 agreement.  [320, at ¶ 139].  Further, Plaintiff explains, (1) the 2010 agreement provides that "RTC expressly reserves the right to assert infringement claims against FFR in the future on any patent that claims priority to one of the Pusher Patents but has not issued as of the Effective Date" [345-1, at 4], and (2) the '427 patent claims priority to the '235 patent [92-2, at 18]..  In response, Defendant acknowledges that the '427 patent was issued after the 2010 agreement, but it explains that (1) the '235 patent is a Pusher Patent and (2) the '427 patent is "a continuation of the '235 patent, has the same specification, and the claims relate to the same technology."  [384, at 13].  Defendant also notes that Plaintiff waited more than six years after the '427 patent issued to file its infringement lawsuit.  Defendant argues that the 2010 agreement and Plaintiff's silence after the '427 patent issued establish the reasonableness of its belief that Plaintiff would not seek to enforce its '427 patent.  However, the text of the 2010 agreement belies Plaintiff's argument: the '427 patent states that it claims priority to the '235 patent, a Pusher Patent, and the 2010 agreement reserves Plaintiff's right to assert infringement claims against Defendant on any patent that claims priority to a Pusher Patent.  The Court agrees with Plaintiff that the complaint does not plausibly allege that Defendant reasonably believed that Plaintiff would not assert infringement claims regarding the '427 patent.  Accordingly, Defendant's equitable estoppel and waiver counterclaims related to the '427 patent are dismissed.

 With respect to the '720 patent, Plaintiff similarly argues that its reservation of rights negates any possibility of Defendant's reasonable belief that Plaintiff would not assert an infringement claim.  However, as Defendant notes, the reservation of rights applies "to activities of FFR (past, present or future) that RTC, to the best of its knowledge, information and belief as

of the Effective Date, is not aware are infringing (directly or indirectly) on one or more of the Pusher Patents." [345-1, at 4]. The Sure-Set System entered the market in 2006, and, at the time of the 2010 agreement, Defendant made over $29 million in total sales in the Sure-Set product line. [320, at ¶¶ 98, 109]. Defendant alleges that, prior to the 2010 agreement, Plaintiff was aware of the Sure-Set System because, as early as 2008, it's CEO, Nathan, "was forwarded an email showing detailed line drawings" of the Sure-Set System. [*Id.*, at ¶ 100]. Nathan also received an email attaching a scanned page from Defendant's product catalog dedicated to the Sure-Safe System in 2009. [*Id.*]. Nathan executed the agreement on behalf of Plaintiff. [*Id.*, at ¶ 101]. From this, it is reasonable for Defendant to have inferred that Plaintiff knew of the Sure-Safe System and would have been aware of whether or not that system infringed its Pusher Patents at the time it executed the 2010 agreement. Therefore, it is also reasonable for Defendant to have inferred that the reservation of rights in the 2010 agreement did not cover any potential claims that the Sure-Set System infringed the '720 patent. Because the counterclaim plausibly alleges that Plaintiff, the patentee, acted in a way to lead Defendant "to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer," *Radio Sys. Corp*, 709 F.3d at 1130, the Court declines to dismiss Defendants equitable estoppel and waiver counterclaims related to the '720 patent.

### B. Request to Strike Portions of Counterclaims under Rule 12(f)

Plaintiff argues that Defendant includes several irrelevant yet scandalous allegations in its counterclaims, and requests that the Court strike several paragraphs. [345, at 14–15]. Under Federal Rule of Civil Procedure 12(f), a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "Allegations may be stricken as scandalous if the matter bears no possible relation to the controversy or may cause the objecting

party prejudice." *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 664 (7th Cir. 1992). "The decision whether to strike material as scandalous is within the discretion of the district court." *Id.*

Here, the counterclaims include allegations related to discovery misconduct in a separate case regarding the '427 patent between these parties. [320, at ¶ 147, 167–171]. Plaintiff argues that the allegations are scandalous and that because the alleged misconduct occurred after the prosecution of the patents at issue, any misconduct cannot be relevant as to whether Defendant stated a claim. The Federal Circuit has explained that later litigation misconduct cannot be the basis for invalidating a patent. See *Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1375 (Fed. Cir. 2001) ("Litigation misconduct, while serving as a basis to dismiss the wrongful litigant, does not infect, or even affect, the original grant of the property right."); *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1234 (Fed. Cir. 1985) (explaining that the court would not declare a patent unenforceable on the ground that the patent holder breached its duty of disclosure to a court).

Defendant attempts to distinguish *Aptix* through reliance on *Regeneron Pharmaceuticals., Inc. v. Merus N.V.*, 864 F.3d 1343 (Fed. Cir. 2017). The *Regeneron* court did rely on post-prosecution litigation misconduct to infer intent to deceive the PTO. *Id.* at 1363–64. It explained that the *Aptix* decision was "inapposite" because there the misconduct occurred only during the litigation, whereas "Regeneron [was] accused not only of post-prosecution misconduct but also of engaging in inequitable conduct during prosecution." *Id.* at 1364. Defendant argues that, like in *Regeneron*, Plaintiff engaged in both post-prosecution misconduct and inequitable conduct during prosecution. However, the court in *Regeneron* made an adverse inference of intent to deceive the PTO in order to sanction litigation misconduct in the case before it, as the party's litigation misconduct "obfuscated its prosecution misconduct." *Id.* Here, in contrast, there is not a sanctions

issue before the Court. Instead, Defendant asks the Court to treat post-prosecution misconduct in a separate case as directly relevant to the merits of its inequitable conduct claim. Because, under *Aptix*, post-prosecution misconduct cannot be the basis to invalidate a patent, Defendant's allegations are immaterial to their claims. The Court accordingly strikes paragraphs 147 and 167–171 (inclusively) from Defendant's counterclaims [320] pursuant to Rule 12(f).

### C. Mootness of Counterclaims II and III

In its second and third counterclaims, Defendant alleges that Plaintiff's Multi-Flip System infringes Defendant's '149 and '006 patents. [320, at ¶¶ 44–90]. Plaintiff argues that these counterclaims are moot because Defendant has already received relief and any alleged infringement cannot reasonably be expected to recur. [188, at 5–12]. Mootness is analyzed under Federal Circuit law. See *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202 (Fed. Cir. 2005); *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 855 (Fed. Cir. 1999). "A case becomes moot when interim relief or events have eradicated the effects of a defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur." *Ferring B.V. v. Watson Lab'ys, Inc.-Fla.*, 764 F.3d 1382, 1391 (Fed. Cir. 2014). As described above, Plaintiff sent Defendant an executed covenant not to make, use, offer, sell, or import the Multi-Flip System and a cashier's check for $40,000, which Plaintiff claims is more than Defendant could ever recover on its counterclaims. Defendant argues that these actions do not moot its second and third counterclaims in part because (1) an unaccepted settlement offer cannot moot a claim and (2) Defendant strongly disputes that $40,000 is more than it could recover.[7]

In *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016), as revised (Feb. 9, 2016), the Supreme Court held that an unaccepted settlement offer cannot moot a case, explaining that "[a]n

---

[7] Defendant also argues that Plaintiff's covenant is insufficient to ensure against any future infringement.

unaccepted settlement offer—like any unaccepted contract offer—is a legal nullity, with no operative effect." *Id.* at 670 (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 81 (2013) (Kagan, J., dissenting)). Defendant contends that it rejected Plaintiff's check and covenant and that therefore its claims are not mooted. However, as Plaintiff notes, the *Campbell-Ewald* Court distinguished a trio of 19th-century railroad tax cases in which the Court held that a defendant's eventual payment of the taxes did moot a case. *Id.*, at 671. In those cases, the Court explained, the defendant actually deposited the full amount demanded in a bank in the plaintiff's name. *Id.* Therefore, "[n]one of those decisions suggests that an *unaccepted* settlement offer can put a plaintiff out of court." *Id.* The Court reserved the issue of "whether the result would be different if a defendant deposits the full amount of the plaintiff's individual claim in an account payable to the plaintiff, and the court then enters judgment for the plaintiff in that amount." *Id.* at 672.

Prior to *Campbell-Ewald*, the Federal Circuit determined that the "tender of the entire amount of damages claimed by a plaintiff moots the damages claim." *Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1331 (Fed. Cir. 2005). After *Campbell-Ewald*, district courts have been divided on the issue. Compare *Ung v. Universal Acceptance Corp.*, 190 F. Supp. 3d 855, 861 (D. Minn. 2016) (reasoning that "there is no reason to treat a rejected *tender* of payment any differently than a rejected *offer* of payment" and concluding that tender of check did not moot the plaintiff's claim), with *Kaplan v. Fulton St. Brewery, LLC*, 2018 WL 2187369, at *6 (D. Mass. May 11, 2018) (finding that unconditional tender of check for more relief than theoretically available to the plaintiffs mooted their claims); see also *Prac. Mgmt. Support Servs., Inc. v. Cirque du Soleil Inc.*, 2016 WL 5720381, at *3 (N.D. Ill. Sept. 30, 2016) (collecting cases).

The Court need not resolve this issue, because even assuming that a tender of a check can moot a claim, Plaintiff's provision of the $40,000 cashiers check does not moot Defendant's

counterclaims here.

Plaintiff claims that $40,000 is more than Defendant could receive on its counterclaims because (1) that amount exceeds Plaintiff's gross revenue for the allegedly infringing product and (2) damages in infringement cases are often calculated by multiplying the infringer's revenue by a royalty rate, such that damages cannot exceed gross revenue. [299, at 8–9]; see also *Whitserve, LLC v. Computer Packages, Inc.*,694 F.3d 10, 27 (Fed. Cir. 2012). Defendant disputes that $40,000 is more than it could recover, and it asserts that Plaintiff has refused any discovery on this issue—despite Judge Valdez's denial of its attempt to stay discovery—making it difficult for Defendant to oppose more thoroughly Plaintiff's hypothetical damages calculation. [292, at 6–10]; see also [169; 265]. Plaintiff does not meaningfully challenge Defendant's assertion that it has not engaged in discovery on these counterclaims. Further, although Plaintiff cites cases in which a court found that the tender of a check mooted a claim, Plaintiff does not direct the Court to a case in which a court found that a tender mooted a claim when the amount of damages is in dispute. See *Russell v. United States*, 661 F.3d 1371, 1374–75 (Fed. Cir. 2011) (finding claim moot when the defendant provided plaintiff with more than plaintiff claimed in his interrogatory responses that he was owed); *Rothe Dev. Corp.*, 413 F.3d at 1331 (explaining that the "tender of the entire amount of damages *claimed by a plaintiff* moots the damages claim" and finding case mooted when the defendant provided plaintiff with "the maximum amount claimed" in the compliant (emphasis added)); *Pakovich v. Verizon LTD Plan*, 653 F.3d 488, 492 (7th Cir. 2011) (finding claim moot after defendant paid plaintiff "the benefits she requested in her complaint, including the amount she was owed at the time and the proper amount going forward"); *Breneisen v. Motorola, Inc.*, 656 F.3d 701, 706 (7th Cir. 2011) (explaining that "[o]nce the defendant offers to *satisfy the plaintiff's entire demand*, there is no dispute over which to litigate" (alteration in

original) (emphasis added) (quoting *Holstein v. City of Chicago*, 29 F.3d 1145, 1147 (7th Cir. 1994))); *Kaplan*, 2018 WL 2187369, at *6 (mooting claim when it was "*undisputed* that" the amounts tendered "represent more relief for plaintiffs' claims for money damages than that theoretically available on the facts alleged" (emphasis added)); *Demmler v. ACH Food Companies, Inc.*, 2016 WL 4703875, at *3 (D. Mass. June 9, 2016) (mooting case when the plaintiff did not assert that he was "entitled to more money" than the defendant tendered).

Here, Defendant disputes Plaintiff's damages calculation both factually and legally. For example, it contends that discovery in another case suggests that Plaintiff's stated gross revenue from the Multi-Flip System does not include sales related to "Multi-Flip kits." [292, at 7]. Although Plaintiff claims that Defendant's arguments are "unreasonable speculation" [299, at 2], the Court cannot make such determination at the motion-to-dismiss stage. In other words, Plaintiff's motion is premature. That said, nothing in this order precludes Plaintiff from making the same mootness argument on a motion for summary judgment, when evidence related to damages would be properly before the Court. Finally, because at this stage the Court cannot conclude that "interim relief or events have eradicated the effects of [Plaintiff's] act[s]," the Court need not consider whether Plaintiff's covenant ensures that "there is no reasonable expectation that the alleged violation will recur." *Ferring B.V.*, 764 F.3d at 1391.[8]

## IV. Conclusion

For the reasons stated above, Plaintiff's motion to dismiss Defendant's fourth counterclaim and third affirmative defense [343] is granted in part and denied in part. It is granted with respect to Defendant's claims of equitable estoppel, waiver, and inequitable conduct regarding the '427

---

[8] Plaintiff argues that, alternatively, the Court should "exercise its discretion to dismiss what has become unnecessary and wasteful litigation" or that the court "should enter a judgment" on the counterclaims. [188, at 12, 14]. The Court declines to do so, in part because both arguments rely on the disputed assertion that Defendant "already received all it could obtain." [*Id.*, at 13].

patent. Accordingly, this portion of the counterclaim is dismissed with prejudice. It is denied with respect to Defendant's claims of equitable estoppel, waiver, and inequitable conduct regarding the '720 patent. Defendant's third affirmative defense is stricken to the same extent. The Court also grants Plaintiff's request to strike paragraph 147 and 167–171 (inclusively) from Defendant's counterclaims [320] under Federal Rule of Civil Procedure 12(f). Plaintiff's motion to dismiss Defendant's second and third counterclaims [187] is denied.

Dated: July 19, 2021

Robert M. Dow, Jr.
United States District Judge

24